UNITED STATES of America, Appellee,

v.

**Angelo RICCO et al.,
Defendants-Appellants.**

**Nos. 1316, 1333 and 1334, Dockets
76–1129, 76–1152 and 76–1191.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 19, 1976.

Decided Feb. 7, 1977.

Certiorari Denied May 2, 1977.
See 97 S.Ct. 1697.

J. Jeffrey Weisenfeld, Goldberger, Feldman & Breitbart, New York City, on the brief, for appellant Ricco.

Howard L. Jacobs, New York City (Donald E. Nawi, New York City, on the brief), for appellant Rizzieri.

Arnold E. Wallach, New York City, for appellant Indiviglia.

Jerry L. Siegel, Asst. U. S. Atty., S. D. N. Y., New York City (Robert E. Fiske, Jr., U. S. Atty., Dominic F. Amorosa and Jeffrey Glekel, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before VAN GRAAFEILAND, Circuit Judge, KELLEHER* and GAGLIARDI,** District Judges.

GAGLIARDI, District Judge:

Angelo Ricco, James Rizzieri, and Charles Indiviglia appeal from judgments of conviction entered in the United States District Court for the Southern District of New York following a three week jury trial before Judge Morris E. Lasker. Each appellant was convicted of conspiring to distribute narcotics, 21 U.S.C. § 846, and of distributing, and possessing with intent to distribute, narcotics, 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A).[1] The principal claim of error raised on this appeal is the not unfamiliar argument that the evidence introduced at trial varied from the indictment by establishing multiple conspiracies rather than the single one charged. Appellants also contend that the prosecutor's comments in summation denied them a fair trial. Additionally, Rizzieri raises claims of prejudicial pre-trial delay and double jeopardy, and Ricco contends his motion for severance was improperly denied. For the reasons which follow, we find each of these contentions to be without merit and, accordingly, affirm the judgments of conviction.

The proof at trial revealed the existence of a relatively uncomplicated conspiracy composed of two or three suppliers who regularly sold large quantities of heroin and cocaine to intermediate distributors, each of whom in turn provided smaller amounts with equal regularity to more numerous retailers or customers. For much of its case the government relied on the testimony of a number of unindicted co-conspirators, including Albert Rossi and Peter Men-

---

* Of The Central District of California, sitting by designation.

** Of The Southern District of New York, sitting by designation.

1. Appellants and nine others were originally charged in the indictment. Prior to trial six of the co-defendants were severed, and appellants were tried together with the remaining three, one of whom, Freddie Blase, was severed dur-

ing the trial. The jury returned guilty verdicts against all five remaining defendants on Count One, the conspiracy count. In addition, the appellants and John DiSalvo were found guilty on all substantive counts in which each was charged. The fifth defendant, George Corrado, was acquitted of the single substantive charge against him. Corrado has not appealed his conspiracy conviction, and DiSalvo has withdrawn his appeal.

grone.[2] In brief outline, the testimony, which was corroborated by other evidence, established that appellant Angelo Ricco and his uncle, Anthony Ricco, also known as Tony Bragiole ("Bragiole"),[3] headed the conspiracy and were its source of narcotics. Ricco and Bragiole (jointly referred to as "the Riccos"), acting with the assistance of appellant Indiviglia, supplied heroin and cocaine on a regular and extensive basis to Rossi, appellant Rizzieri, co-defendant Blase, and Mengrone, who in turn diluted and distributed the narcotics to co-defendants Corrado and DiSalvo, and additional customers. Numerous other co-conspirators participated both as distributors of the drugs and as ultimate retail customers.

### Multiple Conspiracies Claim

Appellants contend that, although the indictment charged them with participation in one ongoing conspiracy lasting from 1971 until 1973, the government at trial established the existence of several independent conspiracies. It is argued that the evidence demonstrated that Blase, Rossi, Rizzieri and Mengrone conducted totally independent distribution operations, drew on drug sources in addition to the Riccos, distributed narcotics for the Riccos during successive and unconnected periods of time, and dealt individually and separately with the Riccos without any conspiratorial connection among themselves on the same distributional level. This variance between indictment and proof, they contend, was fatally prejudicial. See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In assessing these claims we must bear in mind that the question of whether the evidence has established the single conspiracy charged in the indictment is primarily a factual issue to be determined by the jury. United States v. Finkelstein, 526 F.2d 517, 522 (2d Cir. 1975), cert. denied, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). Therefore our review of the proof, which is to be considered in the light most favorable to the government, United States v. McCarthy, 473 F.2d 300, 302 (2d Cir. 1972); United States v. Kahaner, 317 F.2d 459, 467 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963), is undertaken only to determine whether the evidence is sufficient to sustain the jury's finding of a single conspiracy. United States v. Calabro, 449 F.2d 885, 893 (2d Cir. 1971), cert. denied, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972); Dardi v. United States, 330 F.2d 316, 327 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964). From the evidence adduced at trial and set forth below the jury could properly have found as follows.

The conspiracy commenced in October or November of 1971, when Rossi and Blase began purchasing sizeable quantities of heroin from the Riccos. The deliveries of the narcotics were made personally by Ricco or Bragiole, who were routinely accompanied by Indiviglia. By July, 1972 Rossi and Blase had made eighteen such purchases of heroin from the Riccos and had received $20,000 from their resales to numerous narcotics customers.

In July, 1972 Rizzieri began working with Rossi in place of Blase, who was effectively phased out of the conspiracy. Ricco and Bragiole, upon being informed by Rossi of this personnel substitution, met with Rossi and Rizzieri and expressly agreed to continue supplying heroin to what was now the Rossi-Rizzieri distribution partnership. From July until December, 1972 Rossi and Rizzieri received forty to fifty deliveries of very high quality heroin from the Riccos in amounts ranging from an eighth of a kilogram to two kilograms. The Riccos continued their practice of delivering the narcotics personally, accompanied by Indiviglia. Rossi and Rizzieri diluted the heroin to "commercial" purity, and resold it to their customers. These resales occurred on ap-

---

**2.** Rossi and Mengrone pleaded guilty to related federal and state narcotics charges prior to trial.

**3.** Bragiole, indicted on the conspiracy count and four substantive counts, was among the defendants severed prior to trial.

proximately sixty occasions, involved quantities ranging from an eighth of a kilogram to one kilogram, and generated at least $200,000 during the latter half of 1972.

Another change in the conspiracy's membership occurred in January, 1973. Following a dispute over responsibility for a failed attempt to resell two kilograms of heroin, Rossi abruptly withdrew from his distributing relationships with the Riccos and with Rizzieri. Rizzieri continued to function as a distributor of the Riccos' heroin and cocaine until he was arrested on March 14, 1973 after selling one quarter kilogram of heroin obtained from Bragiole to an undercover agent.

The final phase of the conspiracy involved Mengrone's participation as a distributor of the narcotics. Mengrone originally owned and operated the Magic Carpet, a bar and restaurant in the Bronx in which he had observed the Riccos, Indiviglia, Rossi and Rizzieri meet several times a week and engage in secretive discussions during the period from September, 1972 through June, 1973. Following Rizzieri's arrest in March, 1973, Mengrone delivered a message to the Riccos, sent through Rizzieri's girlfriend, to the effect that Rizzieri was "going to stand up and do the time and that nobody had to worry, and . . . he . . . [would] not implicate anybody." Two months later Mengrone asked the Riccos to allow him to distribute narcotics for them. They consented and until his arrest in October, 1973 Mengrone actively solicited customers and participated in numerous attempted transactions.

Although each of the appellants claims to have been substantially prejudiced by proof of separate conspiracies,[4] Rizzieri's claim raises the only serious question, and we turn to it first. He contends that many of the so-called "Ricco distributors" were independent drug dealers in their own right, operating with sources and outlets for narcotics outside the Ricco organization. However, if the single conspiracy charged in the indictment is proved, the fact that

there was also evidence relating to another conspiracy does not require reversal. *United States v. Tramunti*, 513 F.2d 1087, 1107–08 and n. 26 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). Thus the admission of evidence showing that Rizzieri and the others may have engaged in narcotics transactions in addition to those involving the Riccos does not establish multiple conspiracies. *United States v. Tramunti, supra.*

Rizzieri also claims that the activities of the various distributors constituted "spokes" in the conspiracy entirely separate from his own participation, *see Kotteakos, supra*, and that he was prejudiced by the admission of evidence relating only to those allegedly separate conspiracies.

In considering this claim, we note initially that there was considerable evidence establishing both vertical and horizontal interlocking among the conspirators. The distribution of drugs by Rossi and Blase as partners, then Rossi and Rizzieri as partners, then Rizzieri alone, and finally Mengrone was based in each instance on express agreements and personal transactions with the Riccos and resulted in eventual retail sales to a market composed of many of the same buyers throughout the duration of the conspiracy. Furthermore, Rizzieri engaged in a fruitful partnership buying and selling the Riccos' narcotics with Rossi, who had previously maintained the same distribution arrangement with Blase. Blase was present when Rizzieri and Rossi were introduced to each other and they first discussed plans for joint dealings in drugs. Later Blase accompanied them on one occasion when they picked up heroin from Ricco.

Rizzieri's only substantial *Kotteakos* claim concerns the Mengrone distribution. Peter Mengrone did not begin to distribute narcotics for the Riccos until May of 1973, two months after Rizzieri's arrest. Prior to Rizzieri's arrest Mengrone had not realized that the Riccos and their associates were involved in narcotics transactions, although

---

4. No objection was taken to the trial court's charge to the jury on the issue of multiple conspiracies, nor is the charge challenged on this appeal.

as owner of the Magic Carpet he had observed various combinations of the conspirators meet privately in his establishment, and he had transmitted the message after Rizzieri's arrest to the effect that Rizzieri would "not implicate anybody".

We have often held that one who deals in sizeable quantities of narcotics may be presumed to know that he is participating in an organization which extends beyond his individual involvement. *United States v. Magnano*, 543 F.2d 431, 434 (2d Cir. 1976); *United States v. Leong*, 536 F.2d 993, 995–96 (2d Cir. 1976); *United States v. Ortega-Alvarez*, 506 F.2d 455, 457 (2d Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975); *United States v. Mallah*, 503 F.2d 971, 983–84 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

Whether this inference may be drawn, however, depends on the nature of the enterprise and the participant's involvement. *United States v. Miley*, 513 F.2d 1191, 1207 (2d Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975); *United States v. Agueci*, 310 F.2d 817, 827 (2d Cir. 1962), *cert. denied*, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

Although we are satisfied that the activities of Blase, Rossi and Rizzieri with the Riccos and Indiviglia constituted a single conspiracy, the question of whether Mengrone's distributing activities are properly to be included in that conspiracy is not as easily disposed of, for Mengrone did not begin working for the Riccos until May of 1973, two months after Rizzieri had been arrested and incarcerated and five months after Rossi had withdrawn. *Cf. United States v. Lam*, 544 F.2d 58, 65–66 (2d Cir. 1976); *United States v. Miley, supra*, 513 F.2d at 1207.

However, we need not decide this issue of whether the evidence supported a finding of a single conspiracy, for even if Mengrone's dealings with the Riccos did constitute a second conspiracy, we would nevertheless find no reversible error. As we have recently explained,

Where the indictment charges one conspiracy but the proof shows more than one, a variance is not necessarily fatal. "The true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

*United States v. Miley, supra*, 513 F.2d at 1207. *See United States v. Vega*, 458 F.2d 1234, 1236 (2d Cir. 1972), *cert. denied*, 410 U.S. 982, 93 S.Ct. 1506, 36 L.Ed.2d 177 (1973); Rule 52(a), Fed.R.Crim.P.

We are satisfied that any variance from the indictment's charge of a single conspiracy which might have been caused by proof of Mengrone's drug-related activities, which did not commence until May, 1973 and which occurred while Rizzieri was incarcerated following his arrest in March, did not prejudice Rizzieri. Extensive, detailed and highly incriminating testimony was provided by Rossi relating to the numerous narcotics transactions in which Rizzieri was involved prior to his arrest. Rizzieri makes no claim that incriminating out-of-court statements made by individuals with whom Mengrone conspired after May, 1973 were admitted into evidence on the theory that all were members of a single conspiracy. *See* Rule 801(d)(2)(E), Fed.R. Evid.; *United States v. Lam, supra*, 544 F.2d at 66; *cf. United States v. Miley, supra*, 513 F.2d at 1208. Furthermore, the district judge did not charge the jury that, under the rule of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) it could convict Rizzieri of a substantive offense committed by Mengrone or any of the individuals with whom he conspired after May, 1973. *See United States v. Lam, supra*, 544 F.2d at 66; *cf. United States v. Miley, supra*, 513 F.2d at 1208–09; *United States v. Sperling*, 506 F.2d 1323, 1341–42 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975).

Nor can Rizzieri successfully claim that he was the victim of a "spillover effect" by

which the evidence relating to Mengrone's activities tainted the jury's consideration of Rizzieri's own individual criminal responsibility. We have previously indicated that in considering such a claim of spillover guilt transference it is instructive to "determine whether the number of conspiracies proven and conspirators tried was so large as to make it difficult for the jury to weigh the evidence against each defendant carefully and intelligently." *United States v. Lam, supra,* 544 F.2d at 66. In the case before us twelve defendants were originally indicted, and the charges against only five were ultimately submitted to the jury. There were only three unindicted co-conspirators, and at most two conspiracies were proven. Abundant evidence independent of the Mengrone transactions established that Rizzieri was a major distributor of narcotics for the Riccos. This analysis of the relatively uncomplicated nature of the case presented at trial leads us to the firm conclusion that neither the scale of the prosecution nor Rizzieri's status among the conspirators was such as to impair the jury's ability to consider his individual responsibility based on "intelligent differentiation" among defendants.[5] *United States v. Lam, supra,* 544 F.2d at 66; *United States v. Magnano, supra,* 543 F.2d at 435 n. 2; *United States v. Toliver,* 541 F.2d 958, 963 (2d Cir. 1976); *United States v. Miley, supra,* 513 F.2d at 1209. *Cf. United States v. Kotteakos, supra,* 328 U.S. at 774, 66 S.Ct. 1239; *United States v. Bertolotti,* 529 F.2d 149, 156–57 (2d Cir. 1975). Furthermore, although the drug deals to which Mengrone testified did include incidents of threatened violence, they consisted essentially of the same kinds of transactions Rizzieri had conducted and there was absent the voluminous "shocking and inflammatory" testimony of entirely unrelated criminal ventures which was found to be prejudicial in *Bertolotti, supra.*

Ricco and Indiviglia assert other claims concerning proof of multiple conspiracies, none of which are persuasive. The evidence was sufficient to establish that each was closely involved in all phases of the activities charged and proven. Ricco's contention that he was entirely uninvolved in three transactions between Rizzieri and an undercover agent which culminated in Rizzieri's arrest in March of 1973 must be dismissed, for the testimony of that agent permitted the jury properly to conclude that the Riccos had supplied the drugs involved on those occasions.[6] Indiviglia appears to claim prejudicial misjoinder based on what he describes as his minimal involvement in most of the narcotics transactions proven. This claim too is without merit. The evidence established that he was routinely present at the sales of heroin and cocaine involving the Riccos, Rossi, Blase, Rizzieri and Mengrone, and that on occasion he himself delivered the narcotics and negotiated prices. The joinder requirements of Rule 8, Fed.R.Crim.P., are met if the defendants "are alleged to have participated in the same series of acts which are part of a common scheme or plan." *United States v. Bernstein,* 533 F.2d 775, 789 (2d Cir. 1976); *see United States v. Sir Kue Chin,* 534 F.2d 1032, 1035 (2d Cir. 1976); *United States v. Borelli,* 336 F.2d 376, 387 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). The proof establishing Indiviglia's intimate connection with the drug deliveries is more than sufficient to satisfy these requirements.

*Pre-trial Delay and Double Jeopardy*

Rizzieri's claim of prejudicial pre-trial delay and double jeopardy are based on the circumstances surrounding the heroin sale for which he was charged in Count Four of the indictment. Because these circumstances and their consequences are also relevant

---

**5.** An indication of the jury's ability to distinguish among defendants and assess individual culpability is its acquittal of Corrado on the one substantive count in which he was named.

**6.** The circumstances of Rizzieri's arrest and of two prior transactions between Rizzieri and the arresting undercover agent are presented more fully below, under the discussion of Rizzieri's claims of prejudicial pre-trial delay and double jeopardy.

to Ricco's severance claim, discussed below, we will set them forth in some detail.

In addition to being named in the conspiracy count of the indictment, Rizzieri was charged with two substantive counts, Counts Four and Five. Count Four charged Rizzieri, Ricco and Bragiole with distributing 461.9 grams of heroin on or about November 22, 1972.[7] As part of its proof of this transaction, the government called Special Agent Donald Ferrarone, who testified that on November 22, 1972 he bought 461.9 grams from one Peter Angiolillo, who was accompanied by Rizzieri. Agent Ferrarone further testified that he made two subsequent purchases of heroin from Rizzieri directly, first on February 8, 1973 and again on March 14, 1973, and that he arrested Rizzieri upon consummation of this last purchase.

■ Following his arrest by Agent Ferrarone on March 14, 1973 Rizzieri was indicted in the Eastern District of New York on a one count indictment charging him with the substantive offense of distribution of heroin on that date. He pleaded guilty to that charge in the Eastern District in July of 1973 and received a ten-year sentence. The record indicates that as of the date of the trial before Judge Lasker he had been held in Federal custody continuously since his arrest on March 14, 1973. No charges stemming from Rizzieri's participation in the drug sales to Agent Ferrarone on November 22, 1972 or February 8, 1973 were brought against him until the November 22 sale was charged in Count Four of the present indictment, filed on April 23, 1975, and evidence of all three transactions with Agent Ferrarone was introduced as proof of the conduct of the conspiracy charge in Count One.

Rizzieri contends that he was denied due process and his right to a speedy trial by the government's delay in charging him with the November 22 and February 8 sales, and argues in support that at the time of the Eastern District indictment on the March 14 sale the government possessed all the evidence necessary to charge the November and February sales as well. However, he has shown neither that the government intentionally used that delay to gain a tactical advantage over him nor that he was prejudiced thereby, and therefore this claim fails. *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Eucker*, 532 F.2d 249, 255 (2d Cir. 1976); *United States v. Foddrell*, 523 F.2d 86, 87–88 (2d Cir.), cert. denied, 423 U.S. 950, 96 S.Ct. 370, 46 L.Ed.2d 286 (1975).

The proof at trial against Rizzieri on Count One, the conspiracy count, consisted largely of the testimony of Rossi, his co-conspirator. The proof incriminating Rizzieri on Count Four, which charged him with the distribution on November 22, 1972 to Agent Ferrarone, similarly rested heavily on Rossi, for Agent Ferrarone alone could testify merely to Rizzieri's silent attendance at the sale, which was transacted by Peter Angiolillo. Rossi's testimony strongly implicated Rizzieri, for it detailed the drug transactions which were occurring with great frequency during November, 1972 between the Riccos, Rossi and Rizzieri, and retail customers and other distributors, among whom was Angiolillo. Because Rossi did not even begin to cooperate with the government until March, 1974 the delay in charging Rizzieri up to that time was not at all improper. Nor does the delay from March, 1974 until the filing of the indictment in April, 1975 constitute "contrived procrastination", especially considering the complexity of the facts to which Rossi provided crucial information. *United States v. Schwartz*, 535 F.2d 160, 164 (2d Cir. 1976); *United States v. Eucker, supra*, 532 F.2d at 255; *United States v. Finklestein, supra*, 526 F.2d at 525–26. Furthermore, Rizzieri has failed to establish "actual prejudice", *United States v. Foddrell, supra*, 523 F.2d at 88, for the five year term of imprisonment to which he was sentenced by Judge

---

**7.** Rizzieri was also convicted on Count Five, which charged him, Ricco and Bragiole with distributing two kilograms of heroin in November or December of 1972.

Lasker is concurrent with the ten year sentence he received in the Eastern District.

Similarly, there is no merit to Rizzieri's argument that his pleas of guilty in 1973 to the March 14, 1973 sale to Agent Ferrarone created a double jeopardy bar to his indictment on the instant charges. He was charged in the Eastern District solely with the substantive offense of distribution of heroin on March 14. The instant indictment charged him with conspiracy and two substantive counts, the November 22, 1972 sale to Ferrarone and another distribution in November or December of 1972. Since all of these charges differ either in law or in fact from the Eastern District charge to which Rizzieri pleaded guilty, and the evidence introduced against him in the trial below differed from the evidence which would have been used to support his Eastern District conviction, the double jeopardy claim must fail. *United States v. Papa*, 533 F.2d 815, 820 (2d Cir. 1976); *United States v. Cala*, 521 F.2d 605, 607 (2d Cir. 1975); *United States v. Ortega-Alvarez, supra*, 506 F.2d at 457–58.

The fact that the 1973 Eastern District conviction arose from a sale which was also part of the present conspiracy is not enough to establish a double jeopardy claim, for multiple and distinct violations of the narcotics laws arising out of a single transaction may be tried separately, *United States v. Nathan*, 476 F.2d 456, 458–459 (2d Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 171, 38 L.Ed.2d 56 (1973), and a "charge of a wide-ranging narcotics conspiracy consisting of numerous transactions is certainly sufficiently distinct from a charge of a substantive violation based on a single sale." *United States v. Ortega-Alvarez, supra*, 506 F.2d at 457. *See also United States v. Cioffi*, 487 F.2d 492 (2d Cir. 1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2410, 40 L.Ed.2d 774 (1974); *United States v. Campisi*, 248 F.2d 102, 107 (2d Cir.), *cert. denied*, 355 U.S. 892, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957). Rizzieri's conviction for substantive violations raises no double jeopardy problem since the transactions underlying them were not the same as the sale involved in

his 1973 guilty plea. *See, e. g., United States v. Ortega-Alvarez, supra*, 506 F.2d at 458 n. 3.

*Ricco Severance*

Ricco claims that certain concessions made by codefendant Rizzieri through his counsel were so antagonistic to Ricco's own defense that the trial judge committed reversible error in denying his motion for severance. The matter of severance is one addressed to the trial court's discretion, *see* Rule 14, Fed.R.Crim.P.; *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *United States v. Bernstein, supra*, 533 F.2d at 789, and since we find no abuse of that discretion in the trial court's denial of his motion, Ricco's claim must fail. *United States v. Turcotte*, 515 F.2d 145, 150–151 (2d Cir.), *cert. denied*, 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975); *United States v. Jenkins*, 496 F.2d 57, 67–68 (2d Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). A review of the record satisfies us that since Rizzieri's defense strategy was in fact entirely compatible with Ricco's, Ricco was not prejudiced by the joint trial.

Rizzieri and Rossi were named together in Count One, the conspiracy count, Count Four, charging the sale of November 22, 1972 to which Agent Ferrarone testified, discussed above, and Count Five, charging a sale which occurred sometime in November or December of 1972. Rizzieri's defense as to Counts Four and Five was simply to deny any involvement in the heroin transactions charged therein. As to the conspiracy charge, Rizzieri admitted that he participated in the heroin transactions of February 8 and March 14, 1973, to which Agent Ferrarone had testified, but disclaimed any connection with the Riccos, his alleged coconspirators, by denying that they had supplied the heroin he sold to Ferrarone.

The defense presented to the jury by Rizzieri was thus in no way antagonistic to Ricco's, which consisted essentially of a denial of his participation in any of the narcotics transactions with which he was

charged.[8] Both Rizzieri and Ricco denied participating in the heroin sales they were jointly accused of in the substantive counts (Counts Four and Five). Ricco denied his membership in the conspiracy charged, and Rizzieri did the same, disassociating himself from Ricco by conceding he made the heroin sales to Agent Ferrarone in February and March of 1973 while insisting that his source of the drug was someone other than Ricco or Bragiole. We thus find no reason to conclude that Ricco suffered "substantial prejudice" as a consequence of being tried jointly with Rizzieri. *United States v. Borelli*, 435 F.2d 500, 502–03 (2d Cir. 1970), *cert. denied*, 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971); *see, e. g., United States v. Fantuzzi*, 463 F.2d 683, 687 (2d Cir. 1972).

 Nor is our conclusion as to the lack of prejudice altered by the fact that Rizzieri's attorney elicited testimony incriminating both Ricco and Rizzieri while cross-examining Agent Ferrarone concerning the sale Rizzieri conceded making to him on March 14, 1973. In an effort to establish firmly that his client's source of heroin on that occasion was someone other than the Riccos, Rizzieri's counsel asked Agent Ferrarone whether Peter Donovan, Rizzieri's companion who was arrested along with him at the March 14 sale, had told Ferrarone that Rizzieri had obtained the narcotics from Ricco. Although Rizzieri's counsel had earlier announced his intention to pursue this line of questioning, counsel for Ricco chose to object only after Ferrarone had answered three times, in response to repeated questions from counsel and the trial judge, that Donovan had indeed stated to him that Rizzieri identified Bragiole as the source of the heroin Rizzieri had sold to Ferrarone. Far from being a defense tactic by Rizzieri, the revelation of this information linking him with Bragiole flatly contradicted his own defense to the conspiracy charge. Having evidently anticipated that Ferrarone would testify that Ricco had not been named as Rizzieri's source for the March 14 transaction, Ricco cannot utilize this apparent error in trial strategy to "overcome the difficult burden of demonstrating sufficient prejudice to have warranted severance."[9] *United States v. Finklestein, supra*, 526 F.2d at 525.

*Government's Summation*

 The various attacks on the propriety of the government's summation merit only brief discussion. Remarks by the Assistant United States Attorney to the effect that the government accomplice witnesses would be subject to indictment for perjury and other previously uncharged offenses in the event they testified falsely were amply supported by testimony already before the jury and did not prejudice the appellants. These comments did not amount to the government's improper vouching for its accomplice witnesses but simply constituted permissible argument to the effect that these witnesses, whose veracity and credibility had been fiercely attacked by defense counsel, had no motive to testify falsely. *United States v. Aloi*, 511 F.2d 585, 597–98 (2d Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975); *United States v. Koss*, 506 F.2d 1103, 1112–13 (2d Cir. 1974), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975); *see also United States v. Wilner*, 523 F.2d 68, 73–74 (2d Cir. 1975). *Cf. United States v. Gonzalez*, 488 F.2d 833 (2d Cir. 1973).

 The claim that the prosecutor exceeded the bounds of fair comment in his rebuttal summation by offering his opinion on the worth of the government's Witness Protection Program must also fail. Timely objection was taken and sustained by the trial court who carefully avoided any prejudice to appellants by repeating his instruction to the jury that it and not counsel was

---

**8.** Ricco was convicted of four substantive counts in addition to the conspiracy charge.

**9.** Appellant Ricco also contends here that the trial judge erred in not striking the testimony once the hearsay objection was raised. Having

failed to raise the objection in a timely manner under the circumstances, however, counsel waived it. *United States v. Parnes*, 210 F.2d 141, 143 (2d Cir. 1954); *see, e. g., Marx v. United States*, 86 F.2d 245. 251 (8th Cir. 1936).

the sole judge of the credibility of witnesses. The prosecutor's comment came in response to allegations made by defense counsel in their summations to the effect that the government was improperly paying its witnesses in order to obtain their testimony and that the Witness Protection Program was about to be revealed as a major government scandal. In this context and in light of the trial court's prompt and complete curative instruction, the government's comment cannot be considered to be basis for reversal. *See United States v. Canniff,* 521 F.2d 565, 571–73 (2d Cir. 1975), *cert. denied,* 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976); *United States v. Tramunti, supra,* 513 F.2d at 1118–19.

We have carefully considered the other contentions raised by appellants and find them to be wholly groundless. Accordingly, the judgments of conviction are affirmed.